IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

MARK FRIEDMAN, 11571-055,

                Petitioner,

v.

UNITED STATES OF AMERICA,

                Respondent.           02-CR-0048A
_____       07-CV-0545A


**ANSWER
AND
MEMORANDUM OF LAW**


**I. PRELIMINARY STATEMENT**


    The United States, by its attorney, Terrance P. Flynn, United States Attorney for the Western District of New York, Monica J. Richards, Assistant United States Attorney, of counsel, hereby answers the petitioner's motion to vacate, set aside or correct his sentence pursuant to 28 U.S.C. § 2255.


    For the reasons set forth herein, this Court should deny the motion as it is without merit, both factually and legally.

## II. STATEMENT OF THE CASE

On October 1, 2003, a jury convicted petitioner, Mark Friedman, of using the internet in an attempt to persuade, induce, and entice a 14-year old girl to engage in sexual activity, in violation of 18 U.S.C. § 2422(b).  (Docket Entry 96)[1].  The jury also convicted Friedman of traveling from New Jersey to Western New York for the purpose of engaging in a sexual act with the 14-year old girl, in violation of 18 U.S.C. § 2423(b).  (Id.).

On March 9, 2004, this Court sentenced Friedman to a term of imprisonment of 81 months on each count of conviction, to be served concurrently, followed by a three-year term of supervised release. (Docket Entry 110).  The judgment was thereafter entered on April 20, 2004.  (Docket Entry 111).

On appeal to the Second Circuit Court of Appeals (Docket Number 04-2665), Friedman challenged the sufficiency of the evidence, various evidentiary rulings of the trial court, and the trial court's application of the Sentencing Guidelines.  On July 20, 2005, the Second Circuit denied Friedman's first and second claims as without merit and remanded the third claim for

---

[1]    All references herein to "Docket Entry" are to docket entries in the criminal action filed under this Court's Docket Number 02-CR-0048A.

reconsideration of the sentence as directed in <u>United States v. Booker</u>, 543 U.S. 220 (2005) and <u>United States v. Crosby</u>, 397 F.3d 103 (2d Cir. 2005).  <u>United States v. Friedman</u>, 04-2665, 2005 WL 1692620 (2d Cir. July 20, 2005).

On remand to this Court, on or about August 22, 2006, this Court denied Friedman's motion for resentencing.  (Docket Entry 138).

## III. FACTS AND PROCEDURAL HISTORY RELEVANT TO THIS PETITION

### A.   The Indictment and Superseding Indictment

On April 17, 2002, a Federal Grand Jury returned a four-count Indictment charging Friedman with two counts of utilizing the internet to entice two separate minors (Brandi and Nicole)[2] in violation of 18 U.S.C. § 2422(b) (Counts I and III) and traveling interstate for the purpose of engaging in a sexual act with each minor, in violation of 18 U.S.C. § 2423(b) (Counts II and IV). (Docket Entry 8).  The Grand Jury returned a Superseding Indictment

---

[2]     Because both alleged victims were under the age of 18 and because of the nature of the charges, this Court ruled that the victims should be referred to as Individual #1 (as charged in the Indictment under Counts I & II) or Brandi and Individual #2 (as charged in the Indictment under Count III) or Nicole.  On appeal, the Second Circuit used the pseudonym "Cindy" in reference to Individual #1.

revising the specific allegations under Counts I, II, and III and
omitting Count IV.  (Docket Entry 43).

**B.    Relevant Motion in Limine**

Several days before trial, the government filed a motion
pursuant to Fed. R. Evid. 403 and 412 seeking to limit the cross-
examination of Brandi regarding other communications in which
Brandi had been engaged on the internet with persons other than
Friedman, including conversations with a teenage boy identified as
"LizzardBoy" and nude photographs of a teenage boy (Docket Entry
59).  On the day before jury selection, this Court heard extensive
argument by the parties regarding the government's motion in
limine.  (Docket Entries 75 and 115 (transcript) at pp. 22-42).

During the course of the argument and colloquy amongst counsel
and the Court, the Court repeatedly asked defense counsel for what
purpose she sought to introduce the internet conversations Brandi
had with people other than Friedman and/or the nude photographs of
a teenage boy, even though the conversation and pictures might have
a sexual context.  (Docket Entry 115 at pp. 31, 34, 35, 36-37).
Defense counsel and the Assistant United States Attorney (AUSA)
argued their positions in great detail before this Court.  The
defense claimed that the area of cross-examination was appropriate

since it tended to show that their conversations were ". . . cybersex, its nonsense. It means absolutely nothing." (Id. at pp. 30-32, 38).   The government argued that such cross-examination would violate Fed. R. Evid. 412 (sexual history of a witness), and that it was irrelevant to the issues before the jury and would only tend to confuse the jury and misdirect them as to what the law was that they were to consider under Fed. R. Evid. 401, 402, and 403. (Id. at 36-37).

This Court determined that the cross-examination of Brandi regarding other internet conversations had "zero" probative value and that even if it was probative the unfair prejudice would outweigh the probative value.  (Id. at p. 40).  The Court further stated that such inquiry was not relevant because "whether she was fooling around with him or not, is not relevant to whether or not he intended to persuade, induce or entice this minor to engage in sexual activity."  (Id.).  However, the Court did advise defense counsel that depending on how the testimony of Brandi went, it would reconsider its decision during trial.  (Id. at p. 41).

5

**C.    Proof at Trial**

Arthur Fijalkowski, a security guard for the Walden Galleria Mall in Cheektowaga, New York, was to be a government witness at the trial.  However, just before trial, Fijalkowski, who was in the National Guard, was called to service.  A videotaped deposition was taken and presented to the jury pursuant to Fed. R. Crim. P. 15 as Exhibit 104A.  Exhibit 104B was the agreed-upon and redacted transcript.  Fijalkowski testified as follows:

On January 12, 2002, at approximately 4:50 p.m., Fijalkowski was on routine patrol in the parking areas surrounding the Walden Galleria Mall.  (GX 104B, p. 5).[3]  Part of his tour included a three-level parking ramp, the top level of which is "open air" and thus subject to the elements.  (<u>Id.</u> at p. 5).  Upon reaching the third level, Fijalkowski observed a lone car parked in an isolated area.  (<u>Id.</u> at p. 7).  In fact, from where the vehicle was positioned, no other vehicles were visible.  (<u>Id.</u> at p. 8).  The vehicle had New Jersey license plates.  (<u>Id.</u>).

When Fijalkowski approached the vehicle, he observed Friedman in the driver's seat, which was fully reclined; Brandi was lying on

---

[3]    References to "GX" are to the government's trial exhibits and references to "TT" are to the Trial Transcript.

top of him.  (Id. at p. 10).  Fijalkowski further observed that
Friedman had his hand on the skin of the back of Brandi - - her
"tank top" being pushed up.  (Id. at pp. 11-12).  Fijalkowski
stated that the two were kissing.  (Id. at pp. 11, 18).

Fijalkowski knocked on the window and Brandi quickly went to
the passenger seat, while Friedman rolled down his window.  (Id. at
p. 18).  Friedman initially gave his age as 31.  (Id. at p. 19).

Fijalkowski then had a brief conversation with Brandi, at
which time she reported to him that Friedman had lied to her,
claiming that he was 18 years old.  (Id. at pp. 32, 54-55).  Brandi
also advised Fijalkowski that she had met Friedman "on AOL" and
that he had "put the moves on me."  (Id. at p. 45).  It was at
about this time that Fijalkowski called for back-up security
personnel along with a request that the Cheektowaga Police
Department be called.  (Id. at pp 19, 22-23).

Officer John Wanat from the Cheektowaga Police Department also
testified as follows:

Wanat was initially briefed by Fijalkowski then had a short
conversation with Brandi.  She reported to Officer Wanat that she

had been just kissing Friedman and that she had just met him in the
Mall.  She also reported that Friedman had touched her breasts and
put his hands inside her pants.  Brandi also indicated that
Friedman had taken pictures of her.  (TT 78-81).

Based upon the information supplied by Brandi, Wanat went to
Friedman's vehicle and observed a digital camera in the front
seating area (GX 26).  (TT 83)  Wanat seized the camera for
safekeeping pending further investigation and, ultimately, a search
warrant was obtained in order to view its contents.

Wanat also identified Exhibit 26-A as being a post-it note
with Brandi's name on it next to the word, "New York," as an item
that was in Friedman's property in the booking room at the police
station.  (TT 114-117).  Exhibit 26-A was admitted into evidence
over the objection of defense counsel who argued that it was
irrelevant.  (TT 116).

Officer Paul Nazzarett also testified.  His testimony included
the following:

While Officer Wanat was speaking with Brandi and securing the
camera, Officer Nazzarett, escorted Friedman to his patrol car
until matters could be more clearly sorted out.  Friedman stated

8

"please don't arrest me; I'll never come back to Buffalo."  (TT 148-149).  Friedman was held pending such investigation and it was determined that his vehicle would be towed to the Cheektowaga Police Department.  (TT 151-153).

Once back at the Cheektowaga Police Department, Detectives Gary Martz and James Morath began their investigation.  Martz's testimony included the following:

First the detectives interviewed Brandi with her mother present.  (TT 200-201).  The detectives then interviewed Friedman.  (TT 202).

After advising Friedman of his Miranda Rights and obtaining Friedman's waiver (GX 17.02), Friedman provided a written statement to the detectives (GX 17.01).  (TT 214-220).  In his statement, Friedman stated that he lived in New Jersey and that he was 39 years old.  (TT 225).  He advised that he had met Brandi on-line and stated "I think her last name is [then stating Brandi's true name]."  (TT 226).  Friedman admitted to conversing once a day with Brandi and that they also often talked on the phone.  (TT 226-227)).  Friedman stated that he knew Brandi lived with her mother in Cheektowaga, New York, and that she was 14 years old.  (TT 227).  He stated that he and Brandi were "developing a romantic

relationship" and that the only reason he came to meet Brandi was to "see if we were compatible" and "that this was to be their only meeting" until "she was older." (Id.). Friedman further admitted that he had driven "from my home in New Jersey" the night before and that he had stayed at the Days Inn in the Buffalo area. (TT 228). Friedman further stated that Brandi went voluntarily to his car with him, that they "made out" for a while (indicating that they had only kissed) and that they went back into the Mall to get some food. (Id.). Friedman further stated that they went back to his car and that he moved his car to an isolated area in the parking ramp so that they could have "more privacy." (TT 228-229). Friedman admitted to taking pictures of Brandi and that they "made out some more" but that there had been no intercourse as "it was inappropriate for her age." (TT 229-230).

After obtaining these statements, detectives secured a New York State search warrant which authorized a full search of Friedman's vehicle and the download of any pictures from the camera found in Friedman's car. (TT 230).

The government also called several law enforcement witnesses regarding evidence that was obtained from Friedman's car and pictures that were downloaded from Friedman's digital camera. The following were among the items seized from the car:

1.  brown paper bag containing 13 condoms, found in the
    front seating area of the vehicle (GX 41.01);

2.  a package with 32 color photographs depicting a
    young-looking female (not Brandi) with Friedman
    apparently in a hotel room, found in the front seat
    section of the vehicle (GX 42.01);

3.  a bar of Tommy Hilfiger soap which Friedman had
    given to Brandi as a gift, found in the front
    seating section of the vehicle (GX 46.01); a single
    condom found in the glove box of Friedman's vehicle
    (GX 48.01);

4.  2 Durex condoms and 1 Trustex condom found in
    Friedman's Nautica bag in the rear seat (GX 50.07 -
    50.09);

5.  a Days Inn reservation confirmation for the Days
    Inn located in the Town of Tonawanda, New York,
    found in Friedman's Nautica bag in the rear seat
    (GX 50.01); and

6.  Map Quest driving directions from the Days Inn,
    Cheektowaga, New York, to the Walden Galleria Mall
    in Cheektowaga, NY, found in Friedman's backpack in
    the rear seat (GX 51.02).

(TT 230-238 & 242-243).


Also found among Friedman's property was a yellow post-it note

(GX 26A).  On this note were the following handwritten notations,

including the numbering:


|            |                |
| ---------- | -------------- |
| 3 Leana:   | VA             |
| 4 Stephanie: | NJ           |
| 2 Julie:   | FL             |
| 1 Brandi:  | NY             |
|            |                |
| Tiffany:   | BS told        |
| Erica:     | not interested |

11

As noted previously, Brandi is the first name of Individual #1  (GX 26A; TT 114-117).

The Court also admitted into evidence Friedman's camera secured by Officer Wanat (GX 26), as well as some photographs which were downloaded from the camera (GX 26.24, 26.25, 26.26, 26.28, 26.35, 26.36, 26.37, 26.38, 26.45, 26.59, 26.59A, 26.59X, 26.60, 26.60A, 26.60X, 26.64 though 26.71).

Two photographs, GX 26.59 & 26.60, showing an erect penis, were taken only hours before Friedman's encounter with Brandi. This was established by testimony of a representative of the Days Inn of Tonawanda, New York, Virginia Dylo.  Dylo testified regarding a reservation and overnight stay made by Friedman for January 11 and 12, 2002.  (TT 420-432).  Dylo testified that a reservation under the name "Mark Friedman" had been made at the Days Inn on January 10, 2002, at 2:44 p.m. Eastern Standard Time (GX 5.05; TT 426-427).  Dylo also produced a copy of a receipt for Friedman's stay, the register sheet, and a record showing that he had checked in at 9:16 p.m. on January 11, 2002, to Room 247 and that he had checked out at approximately noon on January 12, 2002. (GX 5.02 - 5.04; TT 430-432).  Dylo testified that the photos showing the erect penis, GX 26.59 & 26.60, were from a room in the Days Inn, specifically identifying the bedspread, the furniture,

12

and a rack used by Days Inn for displaying HBO guides, as being the same as in Room 247.  (TT 433-434).

As the result of a search warrant executed at Friedman's residence in New Jersey, Friedman's computer was seized (GX 80). Examination of that computer by a computer forensic examiner, John Shumway, resulted in the extraction of an instant message.  Shumway testified that he was able to locate this remnant of an instant message between "HOTNJGuy" (Friedman's screen name) and "BrandiBrandi27" (Brandi's screen name).  (TT 333-340).  The extracted instant message (GX 80.01) included the following communications:

| | |
|---|---|
| *HOTNJGuy:* | *my face is a LOT cuter than what u see in the pic* |
| *HOTNJGuy:* | *it always gets messed up in pics though* |
| *BrandiBrandi27:* | *ok* |
| *BrandiBrandi27:* | *i like it* |
| *BrandiBrandi27:* | *but one thing* |
| *BrandiBrandi27:* | *i cant see your cock* |
| *BrandiBrandi27:* | *lol* |
| *HOTNJGuy:* | *Brandi* |
| *HOTNJGuy:* | *that u can see for real sat* |
| *BrandiBrandi27:* | *ok* |

13

        HOTNJGuy:              *i want u to see it when its*
                              *hard*

    Shumway testified that he found this remnant of an instant
message in a portion of Friedman's computer known as "virtual
memory."  (TT 333).  Shumway testified that the computer was brand
new with the operating system having been installed only days
before Friedman's arrest and thus this "remnant" had not yet been
overwritten, as would normally occur.  (TT 340-344; GX 80.01).

    In addition to Friedman's computer, investigators also
obtained the computer which Brandi used during her internet
conversations with Friedman (GX 71).  Shumway's computer forensic
examination of this computer located a digital photograph of
Friedman (fully clothed) along with a photograph of his vehicle, GX
71.02 & 71.01, respectively.  (TT 362-367).  There was also a saved
instant message from Friedman which contained the text of the
pop/love song "Brandi," GX 71.04.  (TT 368-373).

    Individual #2, Nicole, the alleged victim under Count III of
the Indictment, also testified.  Nicole was a 15 year old girl also
from the Cheektowaga area.  (TT 457).  Nicole testified that she
met Friedman on the internet through Brandi, and that Friedman said
he was 18 years old.  (TT 463-464).  Nicole testified that Friedman
had repeatedly contacted her through the internet and on the

telephone, repeatedly asking her to meet him, to have sex with him, and saying that she made him "horny" and that he wanted to "tie you up and fuck you so hard." (TT 467-468). Nicole further testified that Friedman stated that they could meet at a hotel. (TT 468). Nicole testified that she refused all of these requests by Friedman.[4] (TT 458, 464-470). Nicole also testified that Friedman sent her a naked picture of himself over the internet, identifying Government Exhibit 26.26 as the one she had received (a frontally naked picture downloaded from the camera seized from Friedman's car). (TT 487-489).

Brandi, Individual #1, also testified. Brandi testified that she originally met Friedman in a chat room on AOL in late November 2001. (TT 493). In summary, she testified to the following:

1.  The first time she encountered Friedman he was using the screen name of "Lovehotgrrls" and that he had asked for her age, sex, and location to which Brandi had replied "14, female, New York." (TT 494-495).

2.  Friedman told Brandi that he was 16 years of age, male, and from New Jersey. (TT 499-500).

3.  Friedman asked Brandi to describe herself and she replied that she had blonde hair, blue eyes, and was 4'10". (TT 498).

---

[4]   Friedman was charged under Count III with attempting to entice Nicole over the internet and over the telephone to engage in sexual activity, Nicole being a minor. The jury acquitted Friedman of this charge.

4.   Friedman asked Brandi whether she had ever had sex. (TT 497).

5.   In the initial internet conversation and over the next several months, Friedman repeatedly asked Brandi to meet him.  (TT 497-499).

6.   At the initial internet conversation and over the next 2 months, Friedman constantly asked her if she would have sex with him. (TT 496-498, 506-512).

In addition to the above type of conversations, Friedman also engaged in various conversations about music, outside activities, and movies.  (See, e.g., TT 509).

Brandi further testified that in addition to the on-line conversations, Friedman made the same type of inquiries and conducted the same type of conversations during telephone conversations which some times ran for several hours.  (TT 506-512).

Through stipulation (GX 105), the Court admitted telephone records from Sprint, Inc. and a summary based thereon (GX 60). Those records revealed that Friedman placed 85 calls to Brandi between December 7, 2001, and January 12, 2002, while placing 20 calls to Nicole between December 23, 2001, and January 5, 2002.

Brandi testified that by late December she agreed to meet Friedman and that it had originally been scheduled for the weekend

16

of January 4, 2002, but that Friedman claimed to have gotten sick and had to cancel the meeting. (TT 511-512). Subsequently, they agreed to meet on January 12, 2002, at 12:30 p.m., in the Spencer's store in the Walden Galleria Mall. (TT 512).

Brandi also identified the remnant of the instant message which had been recovered from Friedman's computer. (TT 512-521). She acknowledged that she was "BrandiBrandi27" and that the transcription was an accurate reflection of a portion of an instant message between herself and Friedman several days prior to their physical meeting. (TT 513). Brandi testified that the "pic" referred to in the instant message was in fact a reference to a picture of Friedman standing naked in a sideways position. (TT 514). Brandi was then shown the pictures downloaded from Friedman's camera (GX 26) and identified one of those the photos (GX 26.35) as the picture which Friedman had been referring to in the extracted instant message. (TT 514-521).

Brandi testified that, in fact, they did meet as planned on January 12 in the Walden Galleria Mall and that after initially walking around, she went to Friedman's car which was parked in a crowded parking area outside the Mall. (TT 523-526). At that time, they began to kiss and Friedman gave her a bar of Tommy Hilfiger soap as a gift. (TT 525-530). Friedman touched her

17

breasts and her vagina during this initial contact.   (TT 529).
They then returned to the Mall to get some food after which time
Brandi voluntarily went back to Friedman's vehicle.  (TT 532-533).

Upon returning to Friedman's vehicle, he moved it to a remote
part of the parking ramp which abuts the Mall.  (TT 533).  They
began to kiss again and Friedman once again touched her breasts and
her vagina and had Brandi rub his penis.  (TT 533-534).

During direct examination, the government reviewed with Brandi
the instant message retrieved from Friedman's computer involving
his naked picture and her reference to his "cock."  (TT 517-518).
The AUSA asked Brandi whether she knew what it meant when she
wrote, "I like it, but one thing, I can't see your cock."  (TT
518).  Brandi answered "No."  (Id.).  The AUSA then asked Brandi if
she knew that a "cock refers to a penis."  (TT 519).  Brandi
replied "Now I do" and that "I had heard it -- but I had heard the
words from my friend."  (Id.).  She testified that she knew it had
something to do with sex and that it dealt with the lower portions
of a person's body.  (Id.).

As a result of the government's inquiry, defense counsel
renewed her motion to allow cross-examination into the earlier
internet messaging between Brandi and "LizzardBoy" in which Brandi

and LizzardBoy engaged in sexually explicit conversation. The
Court heard extensive argument on this issue (TT 585-601) at the
end of which the Court asked counsel for each side to submit a
Memorandum of Law. The Court advised that it would make its
determination the following morning.

On the next day of trial, the Court ruled as follows:

> I received the Memorandums. I've read the
> Memorandums very carefully and the one thing I
> don't think you recognize, Mr. Littlefield, is
> the fact that you asked the question about
> whether or not, on direct, whether or not she
> knew the meaning of that particular word. She
> said no. On that question you opened the
> door. And I am going to allow the defense to
> ask that question, but when you are asking
> this question, I want you to show her a
> transcript of what she said in that third
> party conversation where she indicated.

(TT 610). The Court also ruled that the nude photographs of the
teenage boy were still prohibited from cross-examination. (Id.) The
Court noted that it was its intention to allow defense counsel to
utilize the internet communication between Brandi and LizzardBoy
only to the extent that it was to be shown to Brandi to refresh her
recollection. (TT 611). The Court made it clear that it was not
going to allow the message to come in as extrinsic evidence, only
that it could be used to refresh the witness's recollection about
whether she had ever engaged in sexually specific conversations
with other persons, noting: "we're talking about credibility, we're

19

not opening the door on everything this lady may have said." (TT 612).

When cross-examination of Brandi resumed that morning, defense counsel reminded Brandi of her testimony the prior day regarding the word "cock" and its meaning. (TT 618). Defense counsel also got Brandi to admit that she "never talks like that on the internet." (Id.). Defense counsel then showed her the other instant message between Brandi and LizzardBoy, as the Court had instructed. (TT 618-619). She also asked Brandi questions to disprove her statement that she never talks like that on the internet which included her use of the word "cock" in conversations with others on the internet and with Friedman when Brandi wrote to him, "I can't see your cock." (TT 619-620). Despite Brandi's statement that she did not know what the word meant, defense counsel asked a series of questions to show that Brandi used the word in proper context, i.e, not when talking about school work, not when talking about her mother, but only when talking about sex. (TT 622).

During cross-examination, defense counsel also brought out many inconsistencies between Brandi's original statements given to Cheektowaga police on January 12 (both oral and written) and her trial testimony. In her written statement (GX 16), Brandi claimed

that she had met a friend at the Mall and that Friedman had approached her unexpectedly.  She further stated that her friend disappeared; that Friedman followed her until he grabbed her arm and forced her to his car where he started kissing her; and that she had tried to leave but that Friedman would not allow it. Brandi admitted that she lied in those statements.  She said that she lied because her mother was present and she was scared.  (TT 563-571).

The government's last witness was FBI Special Agent Jackie Dougher who testified about an interview she conducted with Brandi on January 16, 2002, four days after the incident.  Agent Dougher recounted a portion of Brandi's statement which statement was more consistent with her trial testimony than with the original oral and written statements given to Cheektowaga police on the day of the incident, January 12.  (TT 646-648).

At the close of the government's case, the defense made an oral motion to dismiss the indictment pursuant to Fed. R. Crim. P. 29.  (TT 659-662).  After hearing from the government, this Court denied the motion.  (TT 662-664).

The defense then put on several witnesses, including Friedman's former employer, in an attempt to show that Friedman

might have left from his employment in New York City when he traveled to Cheektowaga. (TT 664-668). Also called was a former girlfriend of Friedman, Monique Danford, who identified the contents of the package of 32 photos found in Friedman's car (GX 42.01) as being pictures of her and Friedman when they went to California together. She also testified that she and Friedman had had a sexual relationship and that she had placed some of the condoms found in Friedman's car (the brown paper bag containing 13 condoms, GX 41.01). (TT 678-691). Defense counsel also sought to introduce additional items attributable to Monique Danford (i.e. Exhibits 39 -48 which included exhibits identified as a Valentine card written by Danford, a temporary employment application in Danford's name, an appointment card for Danford, and an envelope addressed to Danford from Mastercard). (TT 686-688). However, in light of a stipulation by the government that it would not contest Danford's statement that she put some of the condoms in Friedman's car, defense counsel withdrew from her attempted admission of the other personal items found in Friedman's car. (TT 688-691).

During cross-examination, Danford stated that she did not know how the remaining condoms got in Friedman's luggage (the condoms found in Friedman's Nautica bag in the rear seat, GX 50.07 - 50.09). (TT 691).

**D.    The Conviction and Sentencing**


On October 1, 2003, the jury found Friedman guilty of Counts I and II (the allegations involving Brandi) and not guilty of Count III (the allegation involving Nicole).   (Docket Entry 96).   On March 9, 2004, this Court sentenced Friedman to a term of imprisonment of 81 months on each count of conviction, to be served concurrently, followed by a three-year term of supervised release. (Docket Entry 110).   The judgment was thereafter entered on April 20, 2004 (Docket Entry 111), and on May 5, 2004, Friedman timely filed a Notice of Appeal.


**E.    The Appeal to the Second Circuit and Limited Remand for Reconsideration of Sentence**


On July 20, 2005, the Second Circuit Court of Appeals denied Friedman's appeal insofar as it challenged the sufficiency of the evidence and certain evidentiary rulings.   United States v. Friedman, 04-2665, 2005 WL 1692620 (2d Cir. July 20, 2005).


Regarding the claim that this Court had improperly curtailed cross-examination of the 14-year old victim, the Second Circuit noted that, "While it is arguable, especially given the prejudicial manner in which the government introduced the issue, that the court

might have given the defense somewhat wider leeway to impact the witness on these matters, we cannot say that its ruling, seeking a fair compromise of allowing reasonable impeachment while preventing diversion of the trial into a test of the victim's sexual proclivities, was error." Id. at *3. Further, the Second Circuit noted that this Court "allowed significant questioning to impeach the witness" and that the witness "was substantially impeached." Id. Ultimately, the Second Circuit found, "[R]egardless of whether the restrictions on cross-examination were error under the Confrontation Clause, we are persuaded that the result was harmless beyond a reasonable doubt and thus passed the test of Delaware v. Van Arsdall, 475 U.S. 673 (1986)." Id. The Second Circuit noted that "The evidence of the defendant's guilt, even without [the victim's] testimony, was extremely strong." Id. The other proof included the testimony of the security guard who interrupted Friedman and the victim in his car, Friedman's instant messages to the victim that upon their meeting he wanted her to see him in an aroused state, and the condoms Friedman had with him in his car. Id. Thus, the Second Circuit found, "The defendant's sexual intentions were overwhelmingly proved" and concluded, "Even if the disputed impeachment had been allowed, we think it clear beyond a reasonable doubt that Friedman would have been found guilty." Id.

Finally, regarding Friedman's third claim, the Second Circuit remanded the case for reconsideration of the sentence based upon United States v. Booker and United States v. Crosby.

On remand to this Court, on or about August 22, 2006, this Court denied Friedman's motion for resentencing, finding that it would not have imposed a sentence materially different had the Booker standards been in effect at the time that Friedman was originally sentenced.  Docket Entry 138.  In conclusion, this Court stated, "To this day, the defendant fails to recognize the import of his actions.  He insists in his letter that he and the victim were 'just kissing' and that he never had any intent to have sex with her.  The evidence at trial clearly established otherwise." Id. at p. 4.

## IV. ARGUMENT

## A.    Relevant Law Regarding 28 U.S.C. § 2255 Generally

Title 28, United States Code, Section 2255, provides a prisoner in federal custody with the ability to move the court which imposed his sentence to vacate, set aside, or correct his sentence if it was in violation of the United States Constitution or federal law.  See United States v. Morgan, 346 U.S. 502 (1954).

25

The Second Circuit has held that a prisoner may collaterally attack a final criminal conviction by way of a § 2255 petition "only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes 'a fundamental defect' which inherently results in a complete miscarriage of justice." Graziano v. United States, 83 F.3d 587, 589-90 (2d Cir. 1996) (citing United States v. Bokum, 73 F.3d 8, 12 (2d Cir. 1995)).

A petitioner who seeks to challenge a criminal conviction collaterally through a § 2255 petition "must overcome the threshold hurdle that the challenged judgment carries with it a presumption of regularity." Williams v. United States, 481 F.2d 339, 346 (2d Cir. 1973). The petitioner has the burden of showing that he is entitled to relief. Id. at 346. "[T]he scope of review on a § 2255 motion should be 'narrowly limited' in order to preserve the finality of criminal sentences and to effect the efficient allocation of judicial resources." Graziano v. United States, 83 F.3d at 590.

The mere presence of constitutional error by itself does not present sufficient grounds for issuance of the writ unless the error is also harmful, i.e., "unless the error had a substantial and injurious effect or influence in determining the jury's

verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).  The writ will issue, however, where the court has grave doubt as to whether the error was harmless.  O'Neal v. McAninch, 513 U.S. 432, 435 (1995).

Most recently in Fry v. Pliler, 127 S. Ct. 2321, 2325 (2007), the Supreme Court held that in order to succeed on a 2255 motion, the petitioner must show that the alleged error had a "substantial and injurious" effect on the jury's verdict, citing Chambers v. Mississippi, 410 U.S. 284 (1973) (quoting Brecht v. Abrahamson, 507 U.S. 619 (1993)).  While it is a more difficult standard for petitioners to satisfy, the Brecht standard applies on collateral review.  The "harmless beyond a reasonable doubt" standard of Chapman v. California, 386 U.S. 18 (1967), applies only on direct appeal.

## POINT I

### DEFENSE COUNSEL DID NOT PROVIDE INEFFECTIVE ASSISTANCE OF COUNSEL

**A.   Law Regarding the Right to Counsel and to Testify**

A defendant's right to counsel as guaranteed by the Sixth Amendment "is the right to effective assistance of counsel." McMann

v. Richardson, 397 U.S. 759, 771, n.14; Strickland v. Washington, 466 U.S. 668, 686 (1984).  To establish a claim that counsel was constitutionally ineffective, a defendant "must show both that his counsel's performance was deficient as measured by objective professional standards, and that this deficiency prejudiced his defense."  Purdy v. United States, 208 F.3d 41, 44 (2d Cir. 2000); Strickland, 466 U.S. at 687; Chang v. United States, 250 F.3d 79, 84 (2d Cir. 2001).

The right to testify is personal to a defendant, and thus a defendant may insist upon testifying, notwithstanding his counsel's objection.  Brown v. Artuz, 124 F.3d 73, 77 (2d Cir. 1997).  Any claim by a defendant that his defense counsel prevented him from testifying must meet the two part Strickland test to establish ineffective assistance.

The Supreme Court has "'declined to articulate specific guidelines for appropriate attorney conduct,'" instead emphasizing that "'the proper measure of attorney performance remains simply reasonableness under prevailing professional norms,'" Wiggins v. Smith, 539 U.S. 510, 523 (2003) (quoting Strickland, 466 U.S. at 688-89), which requires "a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the

time.'" Wiggins, 539 U.S. at 521 (quoting Strickland, 466 U.S. at 688).

When addressing the first prong of the Strickland ineffectiveness test, namely whether counsel's assistance was deficient, the court must determine whether counsel's assistance was reasonable in light of all of the circumstances, and because of the difficulties in making this evaluation, the court must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance.  In other words, the defendant must overcome the presumption that the challenged action might be considered sound trial strategy.  The second prong of the Strickland test focuses on whether counsel's deficient performance rendered a result of the trial unreliable or the proceeding fundamentally unfair.

Under Strickland's standard for evaluating ineffective assistance of counsel claims, judicial scrutiny of a counsel's performance must be highly deferential, and every effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Bell v. Cone, 535 U.S. 685 (2002).  "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or

adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." Id.  Moreover, when a party challenges a decision not to call a particular witness, even greater deference is generally warranted: "[A]n appellate court on a cold record should not second-guess such decisions unless there is no strategic or tactical justification for the course taken." United States v. Luciano, 158 F.3d 655, 660 (2d Cir. 1998) (rev'd on other grounds).


**B.    Discussion**


Friedman alleges in Ground One that his two trial attorneys were ineffective because they failed to present evidence which Friedman believes would have been beneficial to him.  Such evidence includes Friedman's own testimony, certain allegations regarding the time that Brandi's mother was supposed to meet her at the Mall entrance, and certain questions of a defense witness.  Further, Friedman alleges that his counsel were ineffective due to a failure to move to suppress a piece of evidence which was a list of female names.


However, a decision by counsel not to call various witnesses or not to present or move to suppress certain evidence "falls

squarely within the ambit of trial strategy." <u>United States v.</u>
<u>Smith</u>, 198 F.3d 377, 386 (2d Cir. 1999); <u>United States v. Bayless</u>,
201 F.3d 116, 130-31 (2d Cir. 2000) ("[A]ctions or omissions [by
counsel] that 'might be considered sound trial strategy' do not
constitute ineffective assistance."); <u>United States v. Berkovich</u>,
168 F.3d 64, 67 (2d Cir. 1999) ("actions or omissions that 'might
be considered sound trial strategy' do not constitute ineffective
assistance"); <u>United States v. Eisen</u>, 974 F.2d 246, 265 (2d Cir.
1992) ("The decision whether to call any witnesses on behalf of the
defendant, and if so which witnesses to call, is a tactical
decision of the sort engaged in by defense attorneys in almost
every trial."). Given the strong presumption of reasonable
professional assistance this Court must apply, such decisions are
precisely the type of trial decisions the <u>Strickland</u> Court cautions
should not be second-guessed. 466 U.S. at 689.

Further, contrary to Friedman's assertion in his motion papers
that his attorneys were ineffective due to an alleged failure to
impress upon the Court the significance of the time that
Fijalkowski approached the vehicle and the time that Brandi was due
to meet her mother, defense counsel did make that precise argument.
In her closing argument to the jury, defense counsel specifically
argued, "The only thing that happened in the car was they were
kissing. Because if they were going to have sex, it would have

happened, and it didn't happen.  Because the time was running out, because Mom was coming at five o'clock, and Mom came at five o'clock.  Fijalkowski finds them at five to five."  (Docket Entry 127, Closings and Jury Charge Transcript, at 50).  In issuing its order denying the request for resentencing, this Court disregarded the argument, and credited the jury's apparent interpretation of the significance of the timing of Brandi's meeting with her mother. When Fijalkowski approached the vehicle, Friedman was in the driver's seat, which was fully reclined and Brandi was already laying on top of Friedman.  (GX 104B, p. 10).  Because reasonable minds could differ on whether the two could have had sex in the five minute window before Brandi was to meet her mother, this alleged failure does not render counsels' assistance ineffective.

Also, contrary to Friedman's assertion that his counsel were ineffective for failing to introduce evidence that Monique Danford had a habit of leaving items in his car, counsel did attempt to do so.  (TT 686-688).  However, in light of a concession by the government that it would not challenge Danford's statement that she was the person responsible for at least some of the condoms found in Friedman's car, defense counsel made a tactical decision not to further pursue admission of such evidence.  (TT 686-691).  The additional testimony of Danford, both on direct and cross, did not lead to any indication that she was responsible for all of the

condoms found in Friedman's car.  Therefore, a proclivity for leaving items in Friedman's car only took the defense so far. Given the significant concession by the government not to controvert Danford's statement that some of the condoms were hers, there was a "strategic or tactical justification for the course taken by defense counsel."  United States v. Luciano, 158 F.3d at 660. Thus, Friedman's argument that counsel were ineffective for failing to pursue the admission of further items owned by Danford found in Friedman's car, does not support a finding of ineffective assistance of counsel.

Regarding Friedman's final allegation that his counsel provided ineffective assistance, Friedman alleges that counsel failed to move to suppress a list of names found in his car.  The list to which Friedman refers is Exhibit 26-A.  The prosecutor questioned Cheektowaga Police Officer Wanat regarding Exhibit 26-A, which Wanat identified as being a post-it note with a list of names, including Brandi's, as an item that was in Friedman's property in the booking room at the police station.  (TT 114-117). When the prosecutor moved the Court to admit Exhibit 26-A into evidence, Friedman's counsel made the only motion available which was to state: "Judge, I move as irrelevant.  No relevance shown for admission of this document."  (TT 116).  The Court overruled defense counsel's motion.  (Id.).

While Friedman alleges that counsel provided ineffective assistance in that she did not move to suppress the exhibit, he has not offered any basis at all upon which a motion to suppress could have been made.  As Wanat provided uncontradicted testimony that the note was among Friedman's possessions which were found on his person at the time that he was being booked (TT 114-115), it was not found as a result of an unconstitutional search.  In any event, counsel did move against its admission as irrelevant and even had counsel failed to move against the admission of Exhibit 26-A as irrelevant, such a failure would not have rendered the entire proceeding so fundamentally unfair as to warrant a new trial due to the overwhelming other evidence of Friedman's guilt.

## POINT II

### FRIEDMAN'S CLAIM OF PROSECUTORIAL MISCONDUCT DOES NOT WARRANT REVERSAL

**A.    Law Regarding Claims of Prosecutorial Misconduct**

Where a defendant alleges a violation of due process based upon prosecutorial misconduct, he bears a heavy burden.  An aggrieved party must show more than mere trial error to secure reversal; he must demonstrate misconduct so egregious that, when viewed in the context of the entire trial, it substantially prejudiced him.  See United States v. Shareef, 190 F.3d 71, 78 (2d

34

Cir. 1999); <u>United States v. Perez</u>, 144 F.3d 204, 210 (2d Cir. 1998).  "In assessing the alleged misconduct, [this Court] consider[s] 'the severity of the misconduct, the measures adopted to cure it, and the certainty of conviction in the absence of the misconduct.'"  <u>United States v. Parkes</u>, 497 F.3d 220, 233-234 (2d Cir. 2007) (citing <u>United States v. Melendez</u>, 57 F.3d 238, 241 (2d Cir. 1995)); <u>see also</u> <u>United States v. Elias</u>, 285 F.3d 183, 190 (2d Cir. 2002) and <u>United States v. Forlorma</u>, 94 F.3d 91, 95 (2d Cir. 1996).

**B.   Discussion**

     Friedman's allegations asserted in Ground Two of his motion all relate to allegations of prosecutorial misconduct during the oral argument of the direct appeal to the Second Circuit.  There is, however, no statutory or case law to support the claim that statements made during oral argument of a direct appeal can support a claim of prosecutorial misconduct on a § 2255 motion.  The appellate court had before it the record of the trial.

     The first claim of factual error relates to statements regarding Friedman's age.  However, whether Friedman was 39 or 41 and whether the AUSA made a misstatement of Friedman's age before the Second Circuit clearly had no impact on the jury's verdict.

35

The second claim of factual error relates to the AUSA's characterization of the evidence as to whether Friedman told the victim witness that he was 16, 18 or 23. While insisting that he never told her that he was anything other than 23, such an allegation, again, does not show that the AUSA's statements during oral argument before the Second Circuit could possibly have had a detrimental effect on the outcome of his trial. The Second Circuit panel that heard the appeal had before it the testimony of the victim witness and all documents submitted during the trial which provided the panel with the evidence as to Friedman's actual and purported ages.

The third claim of factual error relates to the larger question which was submitted to the Second Circuit during the direct appeal which was whether, in light of the allegations of prosecutorial misconduct during trial, that this Court improperly curtailed the defense's cross-examination of the victim witness. Stated generally, the allegation was that the prosecutor acted improperly in filing the motion in limine to preclude certain evidence that Brandi had had other sexual conversations on the internet and also that her computer retained sexually explicit images not involving Friedman (Docket Entry 59) but then asking questions of Brandi which appeared designed to portray her as sexually naive (TT 517-519). In making similar findings to those

necessary to determine the instant motion, the Second Circuit extensively examined the claim and determined that "While it is arguable, especially given the prejudicial manner in which the government introduced the issue, that the Court might have given the defense somewhat wider leeway to impeach the witness, we cannot say that its ruling, . . ., was error." United States v. Friedman, 2005 WL 1692620 at *3.   Further, the Second Circuit found, "[R]egardless of whether the restrictions on cross-examination were error . . . we are persuaded that the result was harmless beyond a reasonable doubt." (Id.) (citations omitted).   The Second Circuit also noted, "The evidence of the defendant's guilt, even without [the victim's] testimony, was extremely strong."   Id.

Similarly, upon an examination of the instant claim of prosecutorial misconduct during the trial, which requires Friedman to show on this § 2255 motion that the prosecutor's actions had a "substantial and injurious" effect on the jury's verdict, this Court should deny the petition.   Even assuming arguendo that the prosecutor's actions at the time of trial were improper, this Court permitted limited cross-examination, over the prosecutor's strenuous objection, which served to minimize the impact of the prosecutor's actions.   This permitted the defense to impeach Brandi's testimony on cross-examination.   Moreover, the evidence of Friedman's guilt, even without the testimony, was extremely strong.

Brecht v. Abrahamson, 507 U.S. 619, 623 (1993) (the mere presence
of constitutional error by itself does not present sufficient
grounds for issuance of the writ unless the error is also harmful,
i.e., "unless the error had a substantial and injurious effect or
influence in determining the jury's verdict.").

Finally, Friedman alleges that despite the determination of
the claim of prosecutorial misconduct during the trial, that the
AUSA erred during his oral argument before the Second Circuit in
his attestations as to the other evidence of Friedman's guilt.
Friedman cites the AUSA's references: (1) to a list of names
Friedman had with him, (2) that Friedman traveled ten hours to get
to Buffalo from his home in New Jersey, and (3) that there were
condoms in Friedman's car.  However, none of these references
constitute a misstatement of fact.  Rather, it is undisputed that
Friedman had a list of names with him (see GX 26A; TT 114-117),
that he traveled ten hours to get to Buffalo, and that there were
condoms in the car (GX 48.01, GX 50.07 - 50.09).  In attempting to
characterize the references as lies, as to each allegation of fact,
Friedman alleges an underlying innocuous reason for the act.
However, as has been previously stated, the panel that heard the
oral argument had before it the full record and was tasked with
assessing the arguments made both by the AUSA and by Friedman's
appellate counsel.  The appeal presented both a question as to the

sufficiency of the evidence and a claim of whether despite the alleged prosecutorial misconduct, Friedman was prejudiced given this Court's actions and taking into account the other overwhelming evidence against him.    The record is clear that there was sufficient evidence to support the jury's finding and that even without the testimony of the victim witness, the jury would have reached the same verdict.    This undermines Friedman's claim of a constitutional error or an error of law or fact that constitutes "a fundamental defect" which inherently results in a complete miscarriage of justice.

**POINT III**

**THE JURY'S DETERMINATION TO FORGO REVIEW OF THE TRIAL TRANSCRIPT AFTER AN INITIAL REQUEST DOES NOT PROVIDE A BASIS UPON WHICH THIS COURT SHOULD GRANT FRIEDMAN'S MOTION**

While the jury was deliberating it sent a note, through its foreperson, to the Court.  With the jury and counsel present, the Court reviewed the note which stated, "Please may we have a transcript of the trial, and Nicole's testimony of original interview with FBI Agent Jacqueline Dougher." (TT 720).  The Court answered, "First of all, you can't have a transcript of the trial, because we haven't prepared one, we don't have a transcript."  The Court advised, however:

What we can do is we can read back portions of
the testimony that you would like to hear
again.  However it does take some time to get
the testimony together.  It appears that you
want some testimony read back.  I've discussed
this with counsel, and it's the consensus of
both the Government and defense counsel that
it's not clear from the note whose testimony
you would like and what portions of that
testimony you would like to hear.

(TT 720-721).  Further, the Court solicited a specific request for

the name of the witness and what portions of his or her testimony

the jury wanted to hear.  (TT 721).  It concluded by saying, "So

I'm going to send you back again, I'll wait for your note, and let

us know what you want read back."  (TT 722).  The jury did not

follow up on this request.


     Friedman now asserts, for the first time, that the jury was

denied the opportunity to review the trial transcripts.  However,

while it is true that the Court, after consultation with all

counsel, denied the jury's blanket request to review the entire

trial transcript, the Court undisputedly offered the jury an

alternative means of review and directed it to make a specific

request for the portions of the testimony relevant to their

inquiry.  Thus, the Court offered to have a portion of the

testimony read back to them upon receipt of a specific request.

The Court acted well within its discretion in doing so.  Further,

that the jury did not make a more specific request, does not

constitute a constitutional error or an error of law or fact that

40

constitutes "a fundamental defect" which inherently results in a complete miscarriage of justice.

## CONCLUSION

For all the foregoing reasons, this Court should deny Friedman's motion in all respects.

DATED:    Buffalo, New York, November 28, 2007.

Respectfully submitted,

TERRANCE P. FLYNN
United States Attorney
Western District of New York

BY: _____
s/MONICA J. RICHARDS
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York  14202
716-843-5852
Monica.Richards@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

MARK FRIEDMAN, 11571-055,

                Petitioner    :

            -V-            :     02-CR-0048A
                                  07-CV-0545A

UNITED STATES OF AMERICA,

                Respondent    :
_____

## CERTIFICATE OF SERVICE

    I hereby certify that on November 28, 2007 I electronically filed the foregoing Answer and Memorandum of Law with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participants on this case:

        NA


    I hereby certify that I have mailed the foregoing, by the United States Postal Service, to the following non CM/ECF participant:

    Mark Friedman
    #11571-055
    FCI Elkton
    P. O. Box 10
    Lisbon, OH 44432


                        s/Nell R. Daley
                        Legal Assistant